**ABRY PARTNERS V, L.P.,**
**et al., Plaintiffs,**

**v.**

**F & W ACQUISITION LLC,**
**et al., Defendants.**

**No. 1756–N.**

Court of Chancery of Delaware.

Submitted: Jan. 12, 2006.
Decided: Feb. 14, 2006.

Collins J. Seitz, Jr., Kevin F. Brady, Connolly Bove Lodge & Hutz, L.L.P., Wilmington, DE; Mark C. Hansen, Silvija A. Strikis, Kevin B. Huff, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Plaintiffs.

Kevin G. Abrams, J. Travis Laster, Abrams & Laster, L.L.P., Wilmington, DE; Irwin H. Warren, Virginia H. Johnson, Margarita Platkov, Weil, Gotshal & Manges, L.L.P., New York City; James L. Messenger, Patrick J. O'Toole, Weil, Gotshal & Manges, L.L.P., Boston, MA, for Defendants.

STRINE, Vice Chancellor.

This case involves a request by the buy-side of a corporate acquisition contract—the Stock Purchase Agreement—to rescind that contract. The plaintiffs—a group of entities affiliated with a sophisticated private equity firm named ABRY Partners (hereinafter, largely referred to collectively as the "Buyer")—bought a portfolio company from an entity owned by another sophisticated private equity firm, Providence Equity Partners (hereinafter, largely referred to collectively as the "Seller"). The portfolio company that was purchased by the Buyer, F & W Publications (hereinafter, largely referred to as the "Company"), was in the business of publishing magazines and selling books.

As in many acquisition agreements involving private equity firms, the Stock Purchase Agreement carefully delineated the representations and warranties that were being made by the portfolio Company that was being sold and by the owner of that Company. By its plain and unambiguous terms, the Stock Purchase Agreement stated the Buyer's promise that it was not relying upon representations and warranties not contained within the Agree-

ment's four corners and that no such extra-contractual representations had been made.

More critically for purposes of this case, the Stock Purchase Agreement went further. By its terms, it purports to limit the liability of the Seller for any misrepresentation of fact contained within the Agreement to exposure for a claim for damages in arbitration (an "Indemnity Claim") not to exceed the amount of a contractually-established Indemnity Fund. That fund is set at $20 million, or 4% of the $500 million purchase price paid by the Buyer for the portfolio company. By its terms, the Stock Purchase Agreement makes an Indemnity Claim the exclusive remedy of the Buyer for misrepresentation and bars a rescission claim of the nature the Buyer has pled in this court.

The Seller has moved to dismiss this case for failure to state a claim. It asserts that the contractual limitation on liability should be enforced and that the Buyer should be limited to the remedy of an Indemnity Claim for no more than $20 million. Given the sophisticated nature of the parties, and the express stipulation that the exclusive remedy provision of the Agreement was specifically bargained for and was reflected in setting the deal price, the Seller argues that there is no principled basis for the Buyer to escape its voluntarily-accepted limitation on its remedial options.

Although the Buyer makes many counter-arguments that I reject, its most forceful and convincing response is that the contractual limitation on liability is unenforceable as a matter of public policy. Recognizing that the case law of this court gives effect to non-reliance provisions that disclaim reliance on extra-contractual representations, the Buyer has premised its rescission claim solely on the falsity of representations and warranties contained

within the Stock Purchase Agreement itself. In other words, the Buyer has accepted that it had promised that the only representations of fact it was relying upon and the only representations of fact made to it were contained within the Agreement itself, and that this court's jurisprudence will hold it to that promise.

But the Buyer claims that this State's public policy will not go further and tolerate an attempt by a contracting party to immunize itself from a rescission claim premised on false representations of fact contained within a written contract and recognized by the parties to be the factual predicate for their decision to contract. To do so would be to sanction unethical business practices of an abhorrent kind and to create an unwise incentive system for contracting parties that would undermine the overall reliability of promises made in contracts.

For reasons I explain, I conclude that Delaware law permits sophisticated commercial parties to craft contracts that insulate a seller from a rescission claim for a contractual false statement of fact that was not intentionally made. In other words, parties may allocate the risk of factual error freely as to any error where the speaking party did not consciously convey an untruth. In that context, there is no moral imperative to impinge on the ability of rational parties dealing at arms-length to shape their own arrangements, and courts are ill-suited to set a uniform rule that is more efficient than the specific outcomes negotiated by particular contracting parties to deal with the myriad situations they face.

But the contractual freedom to immunize a seller from liability for a false contractual statement of fact ends there. The public policy against fraud is a strong and venerable one that is largely founded on the societal consensus that lying is wrong.

Not only that, it is difficult to identify an economically-sound rationale for permitting a seller to deny the remedy of rescission to a buyer when the seller is proven to have induced the contract's formation or closing by lying about a contractually-represented fact.

For these reasons, when a seller intentionally misrepresents a fact embodied in a contract—that is, when a seller lies—public policy will not permit a contractual provision to limit the remedy of the buyer to a capped damage claim. Rather, the buyer is free to press a claim for rescission or for full compensatory damages. By this balance, I attempt to give fair and efficient recognition to the competing public policies served by contractual freedom and by the law of fraud.

Implementing this balance, I dismiss the Buyer's claims except insofar as it can prove that the Seller intentionally misrepresented a fact within the Stock Purchase Agreement or knew that the Company had misrepresented such a fact. In either situation, the Seller would have been responsible for the injury suffered by the Buyer in reliance upon a lie.

## I. *Facts*

As required, the facts are drawn from the amended complaint and the Stock Purchase Agreement, which is incorporated therein.

### A. *The Pre–Agreement Status Of The Parties*

This case includes the usual multiplicity of related entities involved when a portfolio company of one private equity firm is sold to another private equity firm. I start with the precise details about the status of these entities before the Stock Purchase Agreement was consummated and then define them in a simplified fashion that permits me to describe the relevant facts more clearly.

Plaintiff F & W Publications, Inc. ("F & W") is the operating company whose ownership was the key asset effectively sold in the Stock Purchase Agreement. F & W was and is a publishing company based in Cincinnati, Ohio and incorporated in Delaware. F & W publishes special interest magazines and books both in the United States and internationally. Some of its representative publications include *Popular Woodworking, Scuba Diving, Family Tree Magazine, Country's Best Log Homes,* and *Writer's Digest.*

F & W Acquisition, Inc. ("F & W Acquisition") owned all of the shares of F & W before the Stock Purchase Agreement was consummated. F & W Acquisition was in turn owned by defendant F & W Acquisition, LLC.

The complaint also names as defendants certain entities that were not signatories to the Stock Purchase Agreement. The reason is that these are the firms alleged to have owned F & W Acquisition, LLC, which as we shall see, was the "Selling Stockholder" in the Stock Purchase Agreement. Those defendants are Providence Equity Partners, Inc. and several of its affiliates (collectively, "Providence"). Providence Equity Partners is a Delaware corporation with its principal place of business in Providence, Rhode Island. The affiliates of Providence Equity Partners that are named defendants are alternative entities, including limited partnerships and limited liability companies, all of which are formed under Delaware law and have their principal places of business in Providence, Rhode Island. Providence is a private equity firm that specializes in communications and media companies. Providence, according to the amended complaint, owned or controlled F & W Acquisition, LLC.

The plaintiffs in the case are associated with the buy-side of the Stock Purchase Agreement. ABRY Partners, L.P. and ABRY Partners V Affiliated Investors, L.P. (collectively, "ABRY") are Delaware limited partnerships with their principal place of business in Boston, Massachusetts.[1] ABRY is a media-focused private equity firm that currently owns several media companies, including F & W, throughout the United States. ABRY is the firm that caused F & W to become a plaintiff in its capacity as the successor by merger to New Publishing Acquisition, Inc. ("New Publishing"). New Publishing was the acquisition vehicle used by ABRY to acquire F & W Acquisition in the Stock Purchase Agreement.

Now for the simplification, which is bound up in an explanation of the basic transaction embodied in the Stock Purchase Agreement. Through the Stock Purchase Agreement, New Publishing sought to acquire all the stock of F & W Acquisition. In the Agreement, New Publishing was defined as the "Acquiror." F & W Acquisition was defined as the "Company" because its stock was what was being sold. The only other party to the Agreement was F & W Acquisition, LLC, which owned all of F & W Acquisition, and was defined as the Selling Stockholder. Because the key asset of the F & W Acquisition was F & W, the Agreement required extensive representations and warranties and other commitments by F &

W Acquisition, LLC and the Company on behalf of not only itself but its subsidiaries.

In essence, Providence controlled the Selling Stockholder side of the transaction. F & W Acquisition, LLC was the special-purpose vehicle used by Providence to hold its investment in the underlying F & W business. For that reason, I largely refer to the Providence side of the Stock Purchase Agreement, who are now present as defendants, as the Seller.

Likewise, ABRY controlled the Acquiror side of the deal. New Publishing was ABRY's acquisition vehicle. For that reason, I largely refer to the ABRY side of the Stock Purchase Agreement, who are now present as plaintiffs, as the Buyer.

For purposes of clarity, I conflate the identity of F & W Acquisition and F & W. F & W Acquisition was the direct parent of F & W and was defined as the "Company" in the Stock Purchase Agreement. Collectively, I refer to F & W Acquisition and F & W as the Company.

### B. The Relationship Of The Seller And The Company Before The Sale

Providence (the eventual Seller) became the indirect owner of the Company in 2002. Consistent with industry practice, the Company had its own key managers who had no previous affiliation with the Seller. They were CEO Stephen Kent and CFO Mark Arnett.[2] Because of its ownership

1. The complaint is vague about the exact status of these two ABRY entities. One gets the sense that ABRY Partners, L.P. is ABRY's core entity and invests capital of the firm's principals, while ABRY Partners V is an entity that co-invests the funds of outside investors from whom ABRY Partners, L.P. raises capital. The precise relationship and role of the ABRY plaintiffs is immaterial to this decision.

2. The Buyer claims that these Company executives secretly agreed to leave the Company after the merger and form a competing com-

pany, but the Buyer does not develop this argument by explaining exactly how this fraudulently induced the transaction. In fact, the Seller asserts that Arnett continued to serve as the CFO after the acquisition and invested much of the proceeds he received from the sale of the Company into the new entity owned by the Buyer. Def. Opening Br. at 8 n. 4. Moreover, the Agreement contained a closing condition requiring the termination of CEO Kent and two other executives. Stock Purchase Agmt. § 8.2(g).

interest, however, the Seller did interact with the Company's management through its own principals, including Michael Dominguez, Michael Angelakis, and Chris Halpin, and allegedly took an intense interest in its affairs. In the complaint, the Buyer alleges that the Seller's key operatives, Dominguez and Halpin, were knowledgeable about the Company's operations and regularly discussed its operations and financial performance with Company management.

The complaint alleges that the Seller began contemplating a sale of the Company in late 2004. In March 2005, the Seller announced publicly that it would sell the Company through an auction conducted by Credit Suisse First Boston ("CSFB"), which began contacting and meeting with potential buyers at the Seller's direction. One of the potential buyers contacted by CSFB was ABRY, the eventual Buyer.

According to the complaint, the Buyer expressed to the Seller and CSFB that its offer would be based largely on the Company's free cash flow, as measured by its earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Specifically, the Buyer alleged that it would be willing to pay ten times EBITDA for the twelve months ending June 30, 2005, which would result in a price of approximately $480 million. According to the Buyer, the Seller, through Dominguez, suggested to Company management a desire to show the Buyer that the Company would generate EBITDA of approximately $51 million in that period, which would justify a purchase price of $510 million.[3] The negotiations resulted in the Buyer agreeing to purchase all the stock of the Company for $500 million through the Stock Purchase Agreement. That Agreement was inked on June 11, 2005. The contemplated sale of stock closed on August 5, 2005.

### C. After Closing The Sale, The Buyer Discovers That The Company's Financial Statements Were Inaccurate

Once the Buyer assumed ownership of the Company, it began to uncover a host of serious financial and operational problems. So serious were these problems that the Buyer came to the conclusion that it had been defrauded by the Seller and the Company in connection with the Stock Purchase Agreement.

Specifically, the Buyer alleges that it has become apparent that the Seller and Company management, working in concert, schemed together to manipulate the Company's financial statements in order to fraudulently induce the Buyer into purchasing the Company at an excessive price. Thus, the Buyer claims that the Company's December 2004, March 2005, and June 2005 financial statements contained material misrepresentations and did not accurately portray the Company's financial condition.

With respect to the December 2004 financial statements, the Buyer alleges that the Company manipulated its earnings by overstating magazine revenues through a scheme known as "backstarting," which involves inflating revenues by providing new magazine subscribers with back issues of a magazine when they receive their first issue under the subscription. This allows a publisher to report income earlier by using up more of a subscription in the first month. The Buyer also argues that the Company misstated its performance by using outdated estimates rather than actual numbers to reflect newsstand revenue, failing to account for book returns correctly, and establishing inadequate reserves for obsolete inventory and uncollectible accounts receivable. The Buyer contends

---

3. Am. Compl. ¶ 35.

that this resulted in overstated net revenues, which in turn inflated the Company's EBITDA.

The Buyer argues that the March 2005 financial statements continued the same transgressions that occurred in the December 2004 statements and then exacerbated them with other shenanigans. To wit, the Buyer claims that the Company did not merely inaccurately account for book returns, but that it fraudulently and intentionally reduced the Company's book return reserves by $500,000 in order to increase reported earnings.[4] Similarly, the Buyer also accuses the Company of "channel stuffing" in order to inflate the quarterly revenues reflected in the March 2005 statements. Channel stuffing, in this context, involved the Company offering higher-than-normal discounts to book retailers and discounts to more customers than normal, which artificially inflated revenues. Allegedly, this practice leads to more returns than normal because book retailers cannot sell the entire inventory and therefore return the unsold books to the Company, and the Buyer contends that the Company failed adequately to account for the expected increase in returns.

The Buyer avers that the manipulation of the Company's financial statements became even more blatant and pervasive in the June 2005 financial statements. The Buyer argues that the June 2005 financial statements are particularly important because they were received from the Company less than a week before the August 5 closing. Therefore, the Buyer alleges, the Company and the Seller had an incentive to make them look good to ensure that the Buyer would close the deal.

The June 2005 financial statements are allegedly tainted with the same improprie-ties as the December 2004 and March 2005 financial statements. But the Company is alleged to have engaged in additional chicanery in order to show good end-of-quarter results. To that end, the Company: (1) extended, by a week, the quarterly reporting period of a subsidiary in the United Kingdom in order to increase the revenues and earnings depicted in the June 2005 financial statements; (2) shipped magazines in June that were scheduled to arrive in July in order to recognize revenues from those magazines in June rather than July; (3) manipulated its book club by moving a book club cycle from the second half of 2005 into June to inflate revenues; and (4) reported revenues related to a conference held in June 2005 but delayed reporting expenses from that same conference. That is, the Company allegedly made the quarter ending in June 2005 look artificially better by shorting later financial periods.

Aside from problems with financial statements, the Buyer also argues that the Company misrepresented the implementation status of a book order fulfillment system, which was named VISTA. In the Stock Purchase Agreement, the Company agreed to use "commercially reasonable efforts to implement the Vista Systems on or prior to July 15, 2005."[5] On July 5, outside the context of the Stock Purchase Agreement, the Company allegedly informed the Seller that VISTA was fully functional and was processing orders. But, according to the Buyer, that was not the case. VISTA was not functioning appropriately, and in fact, orders were not shipped for several weeks in July. The failure of VISTA allegedly caused several customers, including Amazon.com, to stop ordering products from the Company.

---

**4.** In April, the Company partially corrected this by reversing $200,000 of the entry.

**5.** Stock Purchase Agmt. § 6.1.

The Buyer alleges that the problems with VISTA were so serious that they constituted a material adverse effect ("MAE") under the Stock Purchase Agreement.[6] Yet, the Company did not give the Buyer any pre-closing notice of these problems, and the Seller certified, as required by § 8.2(h)(i) of the Stock Purchase Agreement, that no MAE occurred before closing.[7]

The Buyer contends that the various misrepresentations and non-disclosures resulted in it purchasing the Company for a grossly overstated value. Specifically, the Buyer alleges that the true value of the Company was more like $400 million than $500 million and that it would never have closed had it known that the Company was propping up its performance with unethical business and accounting practices.

When it learned of these improprieties, the Buyer asked the Seller to rescind the transaction and to take back ownership of the Company. The Seller refused and this suit ensued.

## II. The Claims In The Complaint

The Complaint contains three major counts. Count I asserts a fraudulent inducement claim and seeks rescission of the Stock Purchase Agreement and related relief. The basis for the fraudulent inducement is the course of financial manipulation and non-disclosure I just detailed. Counts II (also a claim for fraudulent inducement) and III (a claim for negligent misrepresentation) rely on the same con-

duct and set forth alternative claims for damages in the event that rescission is not awarded.[8] The Buyer waited until approximately three months after closing to bring its complaint for rescission. This raised the hackles of the Seller, which immediately asserted an array of expected defenses, including laches. Expedited treatment of the case was granted but on the understanding that the first matter for expedited consideration would be the Seller's attack on the complaint. To that end, the Buyer was granted permission to amend its complaint and expedited briefing on a motion to dismiss promptly ensued.

## A. The Terms Of The Stock Purchase Agreement Bearing On The Seller's Liability

Before discussing the Stock Purchase Agreement's particular terms, it is important to place that Agreement in context. Both the Seller and the Buyer are private equity firms. The Company was a portfolio company of the Seller. That meant that the Seller had an intense interest in its value and in keeping with that, the Seller had assigned key personnel, specifically Dominguez, to monitor the performance of the Company and interact with the Company's management during the sale. But that did not necessarily mean that the Seller knew the Company in the same intimate manner that the Company's managers did. The managers had no prior affiliation with the Seller, and like any other private equity firm, the Seller was as

---

**6.** *Id.* at § 8.2(c) (conditioning Buyer's duty to close on the absence of an MAE).

**7.** *See* Am. Compl. Ex. C (Seller's Officer's Certificate) ¶ 3.

**8.** The complaint also contains an unusual Count IV, which need not be described in full detail. It largely seems designed to seek reformation of certain provisions in the Agree-

ment, particularly a limitations period contained in the Agreement that provided the Buyer with ninety days to prepare a closing balance sheet and state any basis for adjustments to the purchase price. The Buyer contends, in light of the alleged fraud, that time period was unreasonable. The parties' briefs do not address this Count in any detail and its relevance, if any after this Opinion, is best addressed at a later time.

much a monitor of, as a partner with, the Company's management.

In view of this common context, it is not surprising that the Stock Purchase Agreement's terms recognized a distinction between the Seller and the Company and gave this distinction importance in addressing questions relating to liability. The Agreement did not conflate the Seller with the Company and make it responsible for everything the Company and the Company's management did or said. Rather, the Seller only accepted responsibility for the Company's actions and words to the extent set forth in the Agreement and the required Officer's Certificate. Nothing about that arrangement is novel to anyone with any rudimentary familiarity with negotiated acquisition agreements, particularly those involving private equity firms.

The first specific provision of the Stock Purchase Agreement requiring recitation is § 7.8, which states:

Acquiror acknowledges and agrees that neither the Company nor the Selling Stockholder has made any representation or warranty, expressed or implied, as to the Company or any Company Subsidiary or as to the accuracy or completeness of any information regarding the Company or any Company Subsidiary furnished or made available to Acquiror and its representatives, except as expressly set forth in this Agreement … and neither the Company nor the Selling Stockholder shall have or be subject to any liability to Acquiror or any other Person resulting from the distribution to Acquiror, or Acquiror's use of or reliance on, any such information or any information, documents or material made available to Acquiror in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby.

This is a critical provision. It operates to define what information the Buyer relied upon in deciding to execute the Agreement. By its plain terms, the Buyer promised that neither the Company nor the Seller had made any representation or warranty as to the accuracy of any information about the Company except as set forth in the Agreement itself. The Buyer further promised that neither the Seller nor the Company would have any liability to the Buyer or any other person for any extra-contractual information made available to the Buyer in connection with the contemplated sale of the Company. Because of this provision, the Buyer was careful to amend its complaint and to premise its claims solely upon alleged misrepresentations of facts that are represented and warranted in the Stock Purchase Agreement itself.

In important ways, the Stock Purchase Agreement goes further than simply limiting the information on which a misrepresentation may be based. The first way is in carefully delineating what party is responsible for which representations and warranties (or for complying with covenants or satisfying closing conditions). In that vein, the Agreement contains far more extensive representations and warranties by the Company than by the Seller. For example, the key representation and warranty that the Seller claims was breached is that which warranted the accuracy of the Company's financial statements. That representation and warranty, contained in § 3.6, states as follows:

The Company Financial Statements: (i) are derived from and reflect, in all material respects, the books and records of the Company and the Company Subsidiaries; (ii) fairly present in all material respects the financial condition of the Company and the Company Subsidiaries at the dates therein indicated and the

results of operations for the periods therein specified; and (iii) have been prepared in accordance with GAAP applied on a basis consistent with prior periods except, with respect to the unaudited Company Financial Statements, for any absence of required footnotes and subject to the Company's customary year-end adjustments.

This is, one can say without danger of refutation, one of the most important representations in any acquisition agreement.[9] And, by its plain terms, it is one made only by the Company and not by the Seller.

Likewise, § 7.10 of the Agreement contained a provision requiring the Company to provide unaudited, month-end financial statements for the period between signing and closing, and requiring the Company to represent that those financial statements were "true and correct in all material respects, were prepared in accordance with GAAP . . . and present fairly in all material respects the financial position of the Company and the Company Subsidiaries on a consolidated basis." Likewise, in § 6.2(j) of the Agreement, the Company covenanted that it would not change its accounting methods in effect as of December 31, 2004 unless mandated by law or a change in GAAP. Those covenants bound only the Company, not the Seller.

The Seller, of course, did make certain representations itself in a short section of the Agreement, Article IV. For example, it represented that it owned the shares of the Company that were to be transferred to the Buyer in the sale.[10]

But the plain terms and structure of the Agreement make it clear that the Seller was not making the much more extensive representations made by the Company in the much longer part of the Agreement setting forth the Company's representations and warranties, which is Article III. Article III contains twenty-two general representations and warranties, many of which had extensive subparts. These representations and warranties were made only by the Company. Article III, in § 3.23, also reinforces the promise of the Buyer that it was not relying on extra-contractual representations by stating:

EXCEPT AS EXPRESSLY SET FORTH IN THIS *ARTICLE III,* THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT LAW OR IN EQUITY IN RESPECT OF THE COMPANY OR THE COMPANY SUBSIDIARIES, OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR

---

9. *See* JAMES C. FREUND, ANATOMY OF A MERGER: STRATEGIES AND TECHNIQUES FOR NEGOTIATING CORPORATE ACQUISITIONS 254 (1975) (" 'We're doing this acquisition, but I've made a deal with the seller that he will only give us *one* representation. Which do you want?' Appropriately forewarned and forearmed, I blurt out my answer with no hesitation: 'The financial statements, of course.' And I think most acquisition lawyers would agree that this is the key warranty."); LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 11.04[8] (2001) (stating that the representation about financial statements is "[p]robably one of the two most important representations a Company is asked to make about its business"); *see also* ABA Comm. on Negotiated Acquisitions, Model Stock Purchase Agreement With Commentary 44 (1995) ("[The] representation [that] requires the delivery of specified financial statements of the Acquired Companies and provides assurances regarding the quality of those financial statements is almost universally present in an acquisition agreement. Financial statements are key items in the evaluation of nearly all potential business acquisitions.").

10. Stock Purchase Agmt. § 4.6.

ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. ACQUIROR HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS *ARTICLE III,* THE ACQUIROR IS ACQUIRING THE COMPANY ON AN "AS IS, WHERE IS" BASIS. THE DISCLOSURE OF ANY MATTER OR ITEM IN ANY SCHEDULE HERETO SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGEMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED.

If this was all the Stock Purchase Agreement said, the contract's plain terms would most logically be read to preclude any suit by the Buyer against the Seller for all representations and warranties made by the Company. Why? Because (i) the Buyer promised that it was only relying on representations and warranties expressly set forth in the Agreement and expressly disclaimed reliance on any other extracontractual information; and (ii) the Agreement plainly indicates that the representations and warranties of the Company are those of the Company alone, and not those of the Seller.

For the obvious reason that it would own the Company after closing, the Buyer naturally wanted the Seller to back up the Company's representations and warranties.[11] The Buyer accomplished that objective to a precisely negotiated extent. For starters, as a closing condition, the Seller was required by § 8.2(h)(i) of the Stock Purchase Agreement to provide an Officer's Certificate stating that the clos-

ing conditions relating to the accuracy of not only the Seller's, but the Company's, representations and warranties were satisfied, that the Company and Seller had complied with the covenants applicable to them, and also that the Company had not suffered events that had or would reasonably be expected to constitute an MAE. In compliance with that requirement, the Seller, through Dominguez, provided the Officer's Certificate, which stated:

> Pursuant to Section 8.2(h)(i) of the Agreement, the undersigned duly elected and authorized officer of the Selling Stockholder, hereby certifies that ... (1) Each representation and warranty of the Company set forth in Article III and the Selling Stockholder set forth in Article IV of the Agreement or in each case deemed made pursuant to Section 7.10(a) is true and correct as of the Closing Date ... (2) Each of the Selling Stockholder and the Company have performed and complied in all material respects with the agreements and covenants required to be performed or complied with by it on or prior to the Closing Date ... (3) Since the date of the Agreement, there has been no change, event or condition of any character (whether or not covered by insurance) which, in the aggregate, has had or would reasonably be expected to have a Company Material Adverse Effect.

The Seller also put its wallet behind the Company's representations and warranties to a defined extent. This was accomplished through a promise by the Seller to indemnify the Buyer if the Company's representations and warranties were incorrect or in other similar, broadly-defined circumstances.[12] Section 9.1 of the Agreement

---

11. *See* Stock Purchase Agmt. §§ 8.2(a)-(c), 8.2(h)(i).

12. *See* ABA Comm. on Negotiated Acquisitions, Model Stock Purchase Agreement at 142 ("Although the inaccuracy of a represen-

sets forth this obligation. It states in pertinent part at subsection (a) that:

[T]he Selling Stockholder agrees that, after the Closing Date, the Acquiror and the Company and ... each controlling shareholder of the Acquiror or the Company ... shall be indemnified and held harmless by the Selling Stockholder from and against, any and all claims, demands, suits, actions, causes of actions, losses, costs, damages, liabilities and out-of-pocket expenses incurred or paid, including reasonable attorneys' fees, costs of investigation or settlement, other professionals' and experts' fees, and court or arbitration costs but specifically excluding consequential damages, lost profits, indirect damages, punitive damages and exemplary damages ... to the extent such Damages ... have arisen out of or ... have resulted from, in connection with, or by virtue of the facts or circumstances (i) which constitute an *inaccuracy, misrepresentation, breach of,* default in, or failure to perform any of the *representations, warranties or covenants* given or made by the *Company* or the *Selling Stockholder* in this Agreement ... [13]

Section 9.1(c), however, goes on to limit the aggregate liability of the Seller for conduct covered by § 9.1(a) to the amount of the escrowed Indemnity Fund, which was established to be $20 million in § 2.4(b). This limitation is part of a very textured subsection that also permits the Buyer to seek damages for breaches of representations and warranties, without

reference to materiality qualifications placed on them in the bring-down clause— that is, the clause of the Agreement that brings the representations and warranties down from the time of signing to the time of closing in the form of closing conditions.[14] In other words, through the Indemnity Claim process, the Buyer clawed back the materiality qualifiers the Company and Seller extracted on the representations and warranties for purposes of closing.

The Stock Purchase Agreement also addresses the exclusivity of the Indemnity Claim provisions of the Agreement. To that end, § 9.9(a) (the "Exclusive Remedy Provision") provides:

Except as may be required to enforce post-closing covenants hereunder ... after the Closing Date the indemnification rights in this *Article IX* are and shall be the sole and exclusive remedies of the Acquiror, the Acquiror Indemnified Persons, the Selling Stockholder, and the Company with respect to this Agreement and the Sale contemplated hereby; *provided* that this sentence shall not be deemed a waiver by any party of its right to seek specific performance or injunctive relief in the case of another party's failure to comply with the covenants made by such other party.

In addition, § 9.9(b) clearly states that "[t]he provisions of *Article IX* were specifically bargained for and reflected in the amounts payable to the Selling Stockholder in connection with the Sale pursuant to *Article II.*" The provisions of Article IX

tation that survives the closing may give rise to a claim for damages for breach of the acquisition agreement without any express indemnification provision, it is customary in the acquisition of a privately held company for the Buyer to be given a clearly specified right of indemnification for breaches of representations, covenants, and obligations and for certain other liabilities. Although customary in

concept, the scope and details of the indemnification provisions are often the subject of intense negotiation.").

13. Stock Purchase Agmt. § 9.1 (emphasis added).

14. *See* KLING & NUGENT § 14.02 (discussing the role of the bring-down clause).

include the Exclusive Remedy Provision, the Indemnity Claim provision, and the Indemnity Fund provision.

Further, the Agreement requires that Indemnity Claims be arbitrated in Massachusetts if they cannot be resolved consensually. Despite the selection of Massachusetts as an arbitration forum, the Agreement, in § 9.5 and § 11.9, also makes clear that Delaware law governs any claim submitted to arbitration. First, § 9.5(e) provides that "[e]xcept as may be otherwise expressly provided herein, for any Contested Claim submitted to arbitration, the burden of proof shall be as it would be if the claim were litigated in a judicial proceeding governed exclusively by the internal Laws of the State of Delaware applicable to contracts executed and entered into within the State of Delaware." Second, in a general choice of law provision in § 11.9(a), the parties also agreed that the Stock Purchase Agreement would be "governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law." Finally, § 11.9(c)(i) of the Agreement invests the courts of Delaware with exclusive jurisdiction over any dispute regarding the Agreement, including cases seeking review of an arbitrator's ruling or award, and embodies the parties' consent to the jurisdiction of this State's courts.

In this case, the Buyer does not argue that it is suing the Seller to cause it to specifically perform, or to enjoin the Seller from failing to comply with, a covenant of the Seller itself. Rather, the Buyer seeks an order requiring the Seller to take back the Company and return to the Buyer $500 million largely on the basis that the Company made false representations and warranties and the Seller provided a false Officer's Certificate, thereby fraudulently inducing the Buyer to sign the Agreement and later close the deal.

## II. *Procedural Framework*

This motion arises under the familiar standards of Court of Chancery Rule 12(b)(6). When addressing a motion to dismiss under that Rule, I must assume the truthfulness of all well-pled facts in the complaint and draw all reasonable inferences in the light most favorable to the plaintiffs, the Buyer.[15] But conclusory allegations that are unsupported by facts contained in the amended complaint will not be accepted as true.[16] After evaluating the complaint in this manner, the court will dismiss the complaint if the pled facts do not support a cause of action.[17]

## III. *Legal Analysis*

The Seller's motion to dismiss raises a host of issues. In this opinion, I concentrate on the principal argument, which is the only one that has merit.[18] That argument is that the Stock Purchase Agreement unambiguously bars the Buyer from seeking rescission and further limits the Buyer to recovery of damages for misrepresentation through an Indemnity Claim with damages limited to the extent of the Indemnity Fund. Before addressing that

**15.** *E.g., Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896 (Del.2002).

**16.** *Id.* at 896–97.

**17.** *Id.*

**18.** For example, the Seller's argument that laches bars a rescission remedy raises a host of factual issues and is not a proper basis for dismissal. Likewise, the remedy of rescission is not so obviously impractical at this time so as to warrant dismissal of that requested form of remedy. Nor is the sufficiency of monetary damages to remedy the harm to the Buyer clear at this stage.

central issue, it is useful to clear away two predicate issues: (1) what substantive law governs the Buyer's claims; and (2) whether the Buyer has satisfied its duty under Court of Chancery Rule 9(b). to plead fraud with particularity.

A. *Is The Buyer's Claim For Fraudulent Inducement Covered By The Choice Of Law Provision Contained In The Stock Purchase Agreement?*

■ The initial question I must grapple with is the relevant law governing the Buyer's claims. The Buyer claims that Massachusetts law governs its claims because its operations were located in Massachusetts. Cutting against the importance of that contact are certain other realities: 1) the Buyer, a collective of Delaware entities, established a Delaware corporation to acquire the Company; 2) the Seller was located in Rhode Island but was also a Delaware entity; and 3) the Company was a Delaware corporation headquartered in Ohio. Most of all, the Stock Purchase Agreement itself minimizes the parties' focus on Massachusetts. Even though it requires arbitration of an Indemnity Claim to occur in Massachusetts, Delaware law is to govern the burden of proof in such proceedings and Delaware courts are to review the arbitrators' rulings.[19] Even more important, § 11.9(a) of the Stock Purchase Agreement clearly states: "This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law."

■ The courts of Delaware are bound to respect the chosen law of contracting parties, so long as that law has a material relationship to the transaction.[20] In this

case, Delaware law clearly has a material relationship to the transaction among the Buyer, the Seller, and the Company. The Seller was a Delaware entity that sold a Delaware corporation to a Delaware limited partnership that used a Delaware corporation to acquire the Company. As, or even more, important, the Delaware General Assembly has instructed us on our State's public policy in cases like this, through the enactment of 6 *Del. C.* § 2708, which states:

> (a) The parties to any contract, agreement or other undertaking, contingent or otherwise, may agree in writing that the contract, agreement or other undertaking shall be governed by or construed under the laws of this State, without regard to principles of conflicts of laws, or that the laws of this State shall govern, in whole or in part, any or all of their rights, remedies, liabilities, powers and duties if the parties, either as provided by law or in the manner specified in such writing are, (i) subject to the jurisdiction of the courts of, or arbitration in, Delaware and, (ii) may be served with legal process. *The foregoing shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State* . . . (b) Any person may maintain an action in a court of competent jurisdiction in this State where the action or proceeding arises out of or relates to any contract, agreement or other undertaking for which a choice of Delaware law has been made in whole or in part and which contains the provision permitted by subsection (a) of this section . . . (c) This section shall not

**19.** Stock Purchase Agmt. §§ 9.5(c), 9.5(e), and 11.9(c)(i).

**20.** *See J.S. Alberici Const. Co., Inc. v. Mid–West Conveyor Co., Inc.,* 750 A.2d 518, 520 (Del.2000).

apply to any contract, agreement or other undertaking ... (ii) involving less than $100,000.[21]

That statute applies here, as the Agreement involves a $500 million contract in which contractual parties who are Delaware citizens have chosen Delaware law and submitted themselves to the jurisdiction of this State's courts.

As a matter of commercial logic, it also makes sense that the Buyer and Seller would choose Delaware law to govern their relations.[22] Although each was physically located in a different New England state and although the Company was headquartered in Ohio, the Buyer and Seller were operating in interstate commerce and wanted a reliable body of law to govern their relationship. They therefore chose the law of the state each had looked to in choosing their juridical home and whose law they wished to have govern their entities. By this means, Buckeyes, Quahogs, and Minutemen could come together using the common language of the Blue Hen, which each embraced as setting forth a reliable and fair set of rules for their commercial relationship.

The Buyer asserts the proposition that the contracting parties only meant for Delaware law to govern contract claims that might arise among the parties, but not claims in tort seeking rescission of the Stock Purchase Agreement on grounds that false contractual representations were made. That division is not sensible. As § 201 of the Restatement (Second) of Conflict of Laws states: "[t]he effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application of the rules of §§ 187–188." In turn, § 187 allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest.[23] Section 201's reasoning is important.[24]

---

**21.** 6 *Del. C.* § 2708 (emphasis added).

**22.** *See Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032–33 (Del.Ch.2005) ("[The] text should not be interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the relations between the parties created by contract."), *aff'd*, 2005 WL 3526441 (Del. Dec. 22, 2005).

**23.** Section 188 of the Restatement only applies if the parties have not chosen the law to apply.

**24.** My ruling is consistent with Vice Chancellor Lamb's decision in *VGS, Inc. v. Castiel*, 2003 WL 723285, at *7 n. 29 (Del.Ch. Feb. 28, 2003). In that case, Vice Chancellor Lamb cited § 201 of the Restatement (Second) of Conflict of Laws with approval, noting that it stood for the proposition that the law governing the agreements also governs fraud and

negligent misrepresentation claims seeking relief for the wrongful inducement of the contract. *Id.* Other courts have applied § 201 in similar circumstances. *See Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1142 (5th Cir.1992) (citing to § 201 and stating that "we believe that the Texas Supreme Court would follow the conflicts principle that the effect of misrepresentation or undue influence upon a contract is determined by the same law that governs the contract. The claimed fraud is fraud in the inducement."). Admittedly, the decision in *Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116 (Del.Ch.2003) took a different approach in reliance on § 145 of the Restatement (Second) of Conflict of Laws, which is a more general provision that does not specifically address the current context. The record of that case reveals that the parties did not refer to § 201 in the arguments to the court. Had they, I have no doubt that the court would have followed § 201 and the reasoning of *Castiel*, decided just a month earlier.

Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.[25] In this regard, it is also notable that the relationship between contract and tort law regarding the avoidance of contracts on grounds of misrepresentation is an exceedingly complex and unwieldy one, even within the law of single jurisdictions.[26] To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.

Here, the Stock Purchase Agreement makes even more plain the need to respect the parties' choice of law. By its plain terms, § 9.1(a) addresses what remedies the Buyer has for damages caused by "inaccuracy, misrepresentation, breach of, default in, or failure to perform, any of the representations, warranties or covenants." At issue in determining the sustainability of the Buyer's claims is the meaning of this provision and whether it is broad enough to encompass even intentional misrepresentations—i.e., intentional fraud. Also at issue is whether the contract, if it does limit the Buyer's right to seek relief

---

**25.** *See, e.g., Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, 1154 (1992) ("When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to all disputes arising out of the transaction or relationship. We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and business-like resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship. Nor do we believe such a person would reasonably desire a protracted litigation battle concerning only the threshold question of what law was to be applied to which asserted claims or issues. Indeed, the manifest purpose of a choice-of-law clause is precisely to avoid such a battle.").

**26.** Leading treatises note that a party aggrieved by fraud typically can seek to avoid a contract under the rubric of either contract or tort law. *See, e.g.,* JOSEPH PERILLO, 7 CORBIN ON CONTRACTS § 28.13 (rev. ed. 2002) ("Whenever a party has fraudulently induced another to enter into a transaction under circumstances giving the latter a right to bring a tort action for deceit, the deceived party may instead elect to avoid the transaction and claim restitution. The converse, however, is not true. Misrepresentation or nondisclosure may render a transaction voidable even if there would be not tort cause of action for deceit."); E. ALLAN FARNSWORTH, 1 FARNSWORTH ON CONTRACTS §§ 4.9, 4.12 (3d ed. 2004) (In § 4.9, it makes clear that "both tort and contract law provide remedies for misrepresentation, sometimes affording the recipient of the misrepresentation a choice between the two. The relevant rules of tort trace their origins to the common law action of deceit ... Most of the relevant rules of contract law are derived from the action for rescission that was originally brought in equity."). The complexity caused by this overlap is illustrated by discussions of the varying elements and state of mind requirements used in considering avoidance claims in tort and contract. *See, e.g.,* FARNSWORTH § 4.12 ("If the recipient of a misrepresentation seeks to hold the maker liable in tort for damages, tradition has it that the recipient must show that the misrepresentation was both fraudulent and material. If, however, the recipient seeks merely to avoid the contract, it is said to be enough to show that the misrepresentation was either fraudulent or material."); *see generally* CORBIN ON CONTRACTS § 28.13 (discussing the elements of fraud); FARNSWORTH § 4.10 (discussing the elements of misrepresentation).

for intentional fraud, is contrary to public policy. When parties have chosen a state's contract law to govern their contract, it is illogical to assume that they wished to have the enforceability of that contract judged by another state's law. Section 2708 of Title 6 of the Delaware Code represents our General Assembly's intent to prevent perverse dichotomies in the linguistics used to determine the meaning and enforceability of contracts. When satisfied, as here, § 2708 also establishes that this State has a material relationship sufficient to satisfy § 187 of the Restatement (Second) of Conflict of Laws.[27]

Finally, in the present situation, I see no reason why Massachusetts law would be chosen, as the Buyer now advocates. That choice is obviously convenient for the Buyer now. The Buyer alleges that it was physically located in Massachusetts and received the contractual representations there, and it believes Massachusetts law is particularly favorable to it. But the buy-side that also received the representations is a group of Delaware entities that used a Delaware acquisition vehicle to be the actual buyer of the Company. Moreover, the Seller was a Delaware entity physically located in Rhode Island and there is no allegation that the transaction actually was haggled out in the home of the Bean and the Cod. Unlike a car accident case, in which a Rhode Island driver collided with a Massachusetts driver on I–195 in Massachusetts and the Rhode Island driver should have expected to be judged under Massachusetts standards, the physical location of the Buyer in this case has less

force as a choice of law factor.[28] The Buyer was a sophisticated private equity buyer operating in interstate commerce. It was a Delaware entity buying a Delaware entity that owned another Delaware entity operating in Ohio from a Seller operating out of Rhode Island.

The self-evidence of the proposition that the Buyer's physical location is important as a choice of law factor escapes me as this scenario is far removed from that which ordinarily makes geography a factor. As significant is the normative proposition that embracing Massachusetts law is founded upon, which is that the commercial interests of buyers in complex sales agreement in interstate commerce trump the interests of sellers. That is, to find that Massachusetts law governs here, one has to conclude that the interests of the Buyer in having the advantages of its home state's law to potentially avoid the agreement in tort are somehow paramount to the interests of the Seller in having the contractual arrangements it negotiated enforced to the greatest extent consistent with the parties' chosen law (or with its own home state of operations). And why slight Ohio?

In reality, Delaware has the greatest interest in having its law applied to this matter, and therefore the other element of § 187 of the Restatement does not require Delaware law to give way. All of the parties to the Agreement had in common that they were Delaware citizens. Our citizens ought to be able to use our law as

---

27. ABA Comm. on Negotiated Acquisitions, Model Agreement and Plan of Merger and Reorganization 212 (Working Draft 2005) (discussing how Delaware, along with several other sophisticated states, has enacted a statute that enables parties to a written contract to specify that the law of that state would govern the parties' relationship even in the absence of any other connection with that

state because "sophisticated parties may have valid reasons to choose the law of a given jurisdiction . . .").

28. Restatement (Second) of Conflicts § 145(2) cmt. f (1971) (stating that the place of injury is less significant in the case of fraudulent misrepresentations).

a common language for their commercial relationships, particularly when those relationships involve interstate commerce and do not center in any material manner on the geography of any particular party's operational headquarters. Put simply, no state has a materially greater interest than Delaware in applying its law to this matter.

All in all, this scenario illustrates the obvious utility of choice of law provisions and the need to ensure that parties seeking to avoid contracts prove their claims under the law chosen by the parties to govern their contract. To enter into a contract under Delaware law and then tell the other contracting party that the contract is unenforceable due to the public policy of another state is neither a position that tugs at the heartstrings of equity nor is it commercially reasonable. The parties to the Stock Purchase Agreement made an effective choice of law, and that law governs the Buyer's attempt to avoid the Agreement.

B. *Does The Buyer's Amended Complaint Plead Facts With Particularity To Establish A Claim Of Fraud As Required By Rule 9(b)?*

 The elements of common law fraud that a plaintiff must plead are familiar. To state a claim, the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless

indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[29] Most of those elements must be pled with particularity, as set forth in Court of Chancery Rule 9(b), which states: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations.[30] Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim.[31]

 Despite these particularity requirements for the circumstances, though, state of mind and knowledge may be averred generally pursuant to Rule 9(b) because "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable."[32] While knowledge may be pled generally, when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this "something" was knowable and that the defendants were in a position to know it.[33]

---

**29.** *See DCV Holdings, Inc. v. Conagra, Inc.,* 889 A.2d 954, 2005 WL 3695841, at *2 (Del. Dec. 8, 2005).

**30.** *H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 145 (Del.Ch.2003).

**31.** *Id.*

**32.** *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208 (Del.1993) (citation omitted).

**33.** *See Albert v. Alex Brown Mgmt. Services, Inc.,* 2005 WL 2130607, at *11 (Del.Ch. Aug. 26, 2005).

■ The Buyer's amended complaint satisfies Rule 9(b). The Buyer has alleged, with specificity, precisely what financial statements were materially false and why they were false.[34] These financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company. Moreover, Dominguez signed the Officer's Certificate required for the transaction to close in his capacity at both the Company and the Seller and certified that the Company's representations as to the financial statements were correct at the closing on August 5, 2005. The Buyer pleads, and the Seller does not refute, that Dominguez is a principal of the Seller, which is being sued for fraudulent representation. Dominguez, as alleged in the complaint, was in close contact with the Company's management on several occasions regarding the financials of the Company, and they discussed such subjects as the preparation of projections to provide potential buyers, the Company's EBITDA, the Company's poor financial performance, and the attainment of certain financial targets identified as important by the Buyer by June 30.[35] Thus, for the purposes of pleading, the complaint adequately pleads that the Seller was in a position to know of the falsity of the financial statements. Likewise, the Seller had an obvious motive for engaging in wrongdoing—it wanted to sell the Company for the highest price possible. Dominguez

stated that if the Buyer "is going to pay 10X [EBITDA], let's try to use part of the day to get [it] to the right EBITDA number. On an adjusted basis, it should be ... north of $51 million."[36] To that end, Dominguez and Providence had reason to worry. Kent informed Dominguez that the first quarter of 2005 was "slow" and that numbers were "worrisome."[37] The Seller therefore had the opportunity and the motive to work with management to influence the financial statements and the operating decisions to achieve desired numbers. Whether the Buyer can prove, at trial, that certain false statements were made by or with the knowledge of the Seller is yet to be determined, but at the pleading stage, the Buyer's fraudulent inducement claim is pleaded with the particularity required by Rule 9(b).

C. *The Crux Of The Matter: Does The Stock Purchase Agreement Itself Bar Even An Otherwise Well–Pled Claim Of Rescission?*

For the purposes of addressing the remaining substantive arguments in this motion, I therefore will accept two of the Buyer's primary contentions as true for the sake of argument: (1) that the complaint sets forth facts supporting an inference that the Company made misrepresentations in its financial statements, the accuracy of which was represented and warranted in the Stock Purchase Agreement by the Company and in the Officer's Certificate by the Seller; and (2) that the

---

**34.** As to these aspects of the particularity requirement, it bears mentioning that the Buyer annexed to its amended complaint a schedule specifying in detail what contractual representations were false and in what manner.

**35.** Am. Compl. ¶¶ 26, 35, 36, 37, and 48. It is also important to note that, for the purpose of satisfying the knowledge requirement, courts have imputed the knowledge of corporate officers and directors to a seller when the agent

was acting within the scope of his authority. *See Nolan v. Eastern Co.*, 241 A.2d 885, 891 (Del.Ch.1968). Here, the various defendant entities are all Providence affiliates and it is fair at the pleading stage to attribute Dominguez's knowledge to all of them.

**36.** *Id.* at ¶ 35.

**37.** *Id.* at ¶¶ 37, 48.

problems with VISTA, particularly insofar as it led Amazon.com to terminate ·distribution of the Company's trade books, could have constituted a material adverse effect under § 8.2(c) of the Stock Purchase Agreement, thereby triggering a contractual duty to disclose the underlying facts to the Buyer on the Company's part, and on the Seller's part in the context of the Officer's Certificate.[38] Relatedly, I assume that the complaint sufficiently alleges that the Seller knew that the Company's financial statements were not materially accurate. The Seller's key contention, however, rests on the notion that even if these assumptions are correct, the Buyer is not entitled to press this lawsuit and obtain rescission.

The Seller's primary argument is that the Stock Purchase Agreement precludes the Buyer from obtaining the relief it seeks in this court. That argument is premised on several elements of the Agreement, which I have described in detail. In summary, though, the argument proceeds as follows. The Stock Purchase Agreement is a carefully negotiated document that allocates economic risk. It was entered into by sophisticated players in the private equity markets. In that Agreement, the parties carefully set forth which representations and warranties were made by the Company and which were made by the Seller. The Buyer also explicitly promised that the only information it relied upon in entering into the Agreement was that represented and warranted in the Agreement itself, thus contractually pledging that it had not relied on extra-contractual representations. In addition, the Buyer agreed to the Exclusive Remedy Provision stating that the only remedy that it had against the Seller for contractual misrepresentations was limited to a claim in arbitration for damages, i.e., an Indemnity Claim. And, in that event, the Seller's liability is capped at the extent of the Indemnity Fund for $20 million. Furthermore, the Agreement explicitly indicated that the Exclusive Remedy Provision and limitation on liability contained in the contract were bargained for and reflected in the sale price.[39]

Instead of seeking the relief permitted to it by the Agreement—an Indemnity Claim—the Buyer is bringing a claim for rescission in court. Not only that, the Buyer is seeking to hold the Seller responsible for representations and warranties made by the Company, when the Seller only agreed to back Company representations to the extent of the Indemnity Fund.

The Seller believes that the Buyer's attempt to avoid the terms of the Stock Purchase Agreement is improper and mandates dismissal. Having signed a contract explicitly disclaiming access to the very remedy it now seeks, the Buyer has contractually forsaken its current preferred remedy and must be held to its bargain. The Seller contends that a deal between sophisticated parties with the free right to walk away is a deal, and the law of this State should honor it.

For its part, the Buyer makes two major counter-arguments. First, the Buyer argues that the Exclusive Remedy Provision of the Stock Purchase Agreement does not limit its remedial options in the manner that the Seller suggests. Second, the Buyer contends that even if the Stock Purchase Agreement does limit the Seller's

---

**38.** The complaint also states facts suggesting that the Company changed its accounting practices in violation of § 6.2(j) of the Agreement and that the Seller falsely certified that the Company had not breached that covenant.

**39.** Stock Purchase Agmt. § 9.9(b).

liability for misrepresentation to an Indemnity Claim by the Buyer, public policy overrides that aspect of the Agreement. According to the Buyer, a provision limiting in any manner the liability of a contracting party for misrepresentation is void. The public policy interest in deterring fraudulent conduct is, says the Buyer, so powerful that it prevents even sophisticated private equity firms from shaping acquisition agreements in which parties trade off price for limitations on liability. Given this background, I will now address the Seller's arguments underlying the motion to dismiss.

1. *Do The Terms Of The Stock Purchase Agreement Purport To Limit The Liability Of The Seller For Intentional, Fraudulent Misrepresentations?*

■ The Buyer argues that this court need not reach its argument that public policy precludes the Agreement from barring its fraud-based rescission claim. According to the Buyer, the Agreement cannot be reasonably read to subject fraud claims, rather than merely breach of contract claims, to the Exclusive Remedy Provision. I find that argument unpersuasive and inconsistent with the plain language of the Stock Purchase Agreement.

Section 9.1 clearly requires the Seller to indemnify the Buyer, but only to the extent of funds on deposit in the Indemnity Fund for damages determined "to have arisen out of or to have resulted from, in connection with, or by virtue of facts or circumstances (i) which constitute an *inaccuracy, misrepresentation, breach of,* default in, or failure to perform, *any of the representations, warranties or covenants.*" [40] The Exclusive Remedy Provision establishes an Indemnity Action as the sole remedy both "with respect to" the Stock Purchase Agreement and "the Sale contemplated hereby." [41]

Recognizing the difficulties that this language presents for it, the Buyer advances two arguments to support its position. First, the Buyer asks me to interpret the word "misrepresentation" in § 9.1 of the Agreement as encompassing negligent and innocent misrepresentations only, not fraudulent misrepresentations. But that argument is not a convincing one, given the common understanding of the term misrepresentation in our legal lexicon. Misrepresentation is defined by Black's Law Dictionary as "the act of making a false or misleading statement about something, [usually] with the intent to deceive." [42] Further, modern legal usage appears to place an even stronger emphasis on the breadth of the term. Specifically, "this word is broad enough to describe a fraudulent as well as a negligent or innocent statement." [43] Courts have embraced this definition.[44]

---

40. Stock Purchase Agmt. § 9.1 (emphasis added).

41. Stock Purchase Agmt. § 9.9(a).

42. BLACK'S LAW DICTIONARY 419 (pocket ed. 1996).

43. BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 567 (2d ed. 1995).

44. *See Liborio v. King,* 150 N.C.App. 531, 564 S.E.2d 272, 276 (2002) (finding that "misrepresentation" normally is broad enough to refer to innocent as well as intentional representations, but in the context of other words in the statute, "misrepresentation" only referred to *intentional* misrepresentations); *Luskin's, Inc. v. Consumer Prot. Div.,* 353 Md. 335, 726 A.2d 702, 717 (Md.1999) (indicating that unqualified, the word misrepresentation is broad enough to encompass intentional or negligent misrepresentations). Aside from courts, treatises take a similarly broad view of the term. The Restatement (Second) of Contracts § 159 (1981) defines misrepresentation as "an assertion that is not in accord with the facts." It is clear from the comments to this

The Buyer also asks me to construe the meaning of the term misrepresentation in the context of the surrounding words in § 9.1(a) on the ground that these surrounding words suggest a narrower meaning.[45] But the surrounding words—"inaccuracy ... breach of, default in, or failure to perform, any of the representations, warranties or covenants"—do not clearly provide any context friendly to the Buyer. Arguably, any of these states of facts (e.g., an inaccuracy) or acts (e.g., a breach or default) can be the result of willful or unintentional conduct. Moreover, by including the term misrepresentation along with the term "inaccuracy," the Agreement is more reasonably read as trying to cover all possible claims relating to false representations, including situations when a representation was not merely "inaccurate," but also when the party making it had known it was inaccurate and nonetheless "misrepresented" the facts.

The Buyer's second argument is no more convincing. The argument is that § 9.1(a) only addresses claims that sound purely in contract and not those that sound in tort. In other words, according to the Buyer, it is barred from seeking to avoid the Agreement on the grounds that false representations render the contract avoidable under contract law. Nonetheless, to the extent the Buyer couched its misrepresentation claim as one sounding in tort, the Buyer argues that the Exclusive Remedy Provision of the Agreement has no application.

I do not find this argument either linguistically or logically appealing. The term misrepresentation, as just discussed, is one commonly associated with fraud claims sounding in tort and must be given its plain meaning. And, as a matter of commercial logic, the Buyer's separation of tort and contract claims has no more appeal. It is difficult to fathom why rational contracting parties would attempt to cut, by contract, a clear division that American jurisprudence has never been able to achieve: a division between the role of contract and tort law in addressing the consequences of false representations inducing the making and closing of contracts. Under American law, buyers claiming to be the victims of such representations have traditionally been able to seek to avoid a contract (or in the alternative, recover damages) in either contract or tort.[46] For that reason, it would pro-

section that misrepresentation, as a broad term, is intended to cover fraudulent misrepresentation. *See* Restatement (Second) of Contracts § 159 cmt. a (1981) ("Whether a misrepresentation is fraudulent is determined by the rule stated in § 162(1). However, an assertion need not be fraudulent to be a misrepresentation."). One can, in fact, read this to state that the default assumption when using misrepresentation is that it refers to fraudulent conduct and that this section is taking steps to ensure that readers understand misrepresentation to cover non-fraudulent misrepresentations as well. Section 525 of the Restatement (Second) of Torts defines misrepresentation as "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." Restatement (Second) of Torts § 525 cmt. a (1977).

45. *See Luskin's,* 726 A.2d at 717 (finding that the doctrine of *ejusdem generis* required misrepresentation to be given a meaning consistent with the words around it).

46. Both the Restatement of Contracts and Restatement of Torts (as well as the Restatement of Conflict of Laws discussed earlier) address fraudulent inducement. The Restatement (Second) of Contracts § 164 offers that "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Comment A of the Restatement (First) of Contracts § 471 succinctly states the problem—"Fraud is a word used in more than one branch of the law, and the meaning with which the word is used in various branches is not always identical."

vide little comfort to a Seller to limit its exposure to misrepresentation claims sounding only in contract and not to those arising in tort. In this respect, language and logic also connect, as no one seeking to draw this division would use the word misrepresentation without explicitly qualifying it to apply to only claims sounding in contract because that word is so redolent of tort.[47] Furthermore, § 9.1 is written expansively to encompass "any and all claims, ... causes of action, [and] ... damages, ... to have arisen out of or to have resulted from, in connection with, or by virtue of facts or circumstances ... which constitute a[ ] ... misrepresentation." This language bespeaks of breadth—not of an attempt to capture only contract claims.[48]

For all these reasons, I conclude that the Seller's reading of the Exclusive Remedy Provision is correct. Absent an overriding public policy, the plain terms of the Exclusive Remedy Provision would limit the Buyer to an Indemnity Claim for damages capped at the amount of the Indemnity Fund, and would bar its claim for rescission.

2. *Is The Buyer Permitted To Seek Rescission In This Court Despite The Exclusive Remedy Terms Of The Stock Purchase Agreement?*

■ Having determined that the Stock Purchase Agreement's plain terms would, if given legal effect, preclude the Buyer from seeking rescission, I must now consider the Buyer's argument that public policy intervenes to trump contractual freedom and to prevent that preclusion. That public policy argument continues a longstanding debate within American jurisprudence about society's relative interest in contractual freedom versus establishing universal minimum standards of truthful conduct for contracting parties.

The present case is starker than the typical case. That reality is best illustrated by understanding the burden that the

---

Fraud, in the contract sense, is "(a) a misrepresentation known to be such, or (b) concealment, or (c) non-disclosure ... by any person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction...." Restatement (First) of Contracts § 471 (1932). In the realm of tort, fraudulent misrepresentation has a similar flavor: "[o]ne who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." Restatement (Second) of Torts § 525 (1977). Generally, courts recognize a fraud in the inducement claim sounding in tort as separate from a claim to avoid the agreement under contract law as a result of false representations. *See H–M Wexford*, 832 A.2d at 146–47 (allowing a claim for fraud to proceed based on alleged false representations made in a Purchase Agreement).

**47.** In fact, the Restatement (Second) of Torts uses "Misrepresentation" as an overarching division of tort law. In the Restatement, the term "misrepresentation" encompasses numerous types of fraudulent misrepresentations, including the former tort of deceit, negligent misrepresentations, and the elements of each.

**48.** Section 9.1 is impossible to read as covering only contract claims because it specifically addresses when the Seller is responsible to indemnify the Buyer for certain types of damages that are typically available only in tort and not contract, to wit, punitive and exemplary damages. *See, e.g., E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445 (Del.1996) ("[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."); *J.J. White, Inc. v. Metropolitan Merchandise Mart*, 107 A.2d 892, 894 (Del.Super.1954) (discussing how exemplary damages are generally not available in contract claims).

Buyer has voluntarily taken on, without raising a legal peep. The burden is that of demonstrating that its rescission claim is based on false representations of fact embodied within the four corners of the Stock Purchase Agreement itself.

There are several perspectives in American law regarding the extent to which a contract can define those representations of fact upon which the parties' decision to contract was based. Some case law says that even if a contracting party explicitly promised that no representations of fact not contained in the contract had been made to it and further explicitly promised that it was only relying on representations of fact within the contract, that same contracting party could come forward later and assert that an extra-contractual representation of fact induced its decision to sign the contract.[49]

When addressing contracts that were the product of give-and-take between commercial parties who had the ability to walk away freely, this court's jurisprudence has taken a different approach. We have honored clauses in which contracted parties have disclaimed reliance on extra-contractual representations, which prohibits the promising party from reneging on its promise by premising a fraudulent inducement claim on statements of fact it had previously said were neither made to it nor had an effect on it.[50]

---

**49.** The case law along these lines is not always as focused as would be ideal on the precise terms of the contract and sometimes has tended to conflate distinctive contractual provisions that address the scope of representations and agreements made under broad terms such as "merger or integration clauses." Recognizing that, a sampling of the cases tending to give little effect to contractual disclaimers of representations not contained within the contract's four corners includes: *Northwest Bank and Trust Co. v. First Illinois Nat'l Bank*, 354 F.3d 721, 725–26 (8th Cir.2003); *RepublicBank Dallas, N.A. v. First Wisconsin Nat'l Bank of Milwaukee*, 636 F.Supp. 1470, 1473–74 (E.D.Wis.1986); *Oak Industries, Inc. v. Foxboro Co.*, 596 F.Supp. 601, 608 (S.D.Cal.1984); *Slack v. James*, 364 S.C. 609, 614 S.E.2d 636, 640–41 (2005); *Miles Excavating, Inc. v. Rutledge Backhoe and Septic Tank Services, Inc.*, 23 Kan.App.2d 82, 927 P.2d 517, 518 (1996); *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941). The Restatement and some leading treatises tend towards this conflation as well in inclining towards the same approach. *See* Restatement (Second) of Contracts § 214 cmt. c (1981) ("What appears to be a complete and binding integrated agreement ... may be voidable for fraud. Such invalidating causes need not and commonly do not appear on the face of the writing. They are not affected even by a 'merger' clause."); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 33.21 (4th ed. 1999) ("The better view is ... to ask whether a fraudulent misrepresentation (as opposed to, say, a warranty) has been made and whether the party asserting the fraud would have entered the agreement had he or she known the representation was false; if not, the contract should be voidable to the same extent as if there were no merger clause and, indeed, as if there were no writing ..."); CORBIN ON CONTRACTS § 28.21 ("Written contracts frequently contain merger clauses stating that the writing contains the entire contract and that no representations other than those contained in the writing have been made. Despite the existence of a merger clause, parol evidence is admissible for purposes of demonstrating that the agreement is void or voidable or for proving an action for deceit ...").

**50.** *See Homan v. Turoczy*, 2005 WL 2000756, at *16–7 (Del.Ch. Aug. 12, 2005); *Kronenberg v. Katz*, 872 A.2d 568, 591–93 (Del.Ch.2004), *aff'd*, 867 A.2d 902 (Del.2005); *H–M Wexford*, 832 A.2d at 142; *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del.Ch. Jul. 9, 2002); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch.2001); *see also MBIA Insurance Corp. v. Royal Indemnity Co.*, 426 F.3d 204, 218 (3d Cir.2005) (Alito, J.) (applying Delaware law and predicting that "when sophisticated parties have inserted clear antireliance language ... Delaware's highest court will enforce it to bar a subsequent fraud claim.").

In fact, in *H–M Wexford LLC v. Encorp, Inc.*, this court characterized its recent cases as "consistently holding that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract."[51] As an example, in *Progressive Int'l Corp. v. E.I. Dupont de Nemours & Co.*, the parties entered into a License Agreement that contained an integration clause stating: "This LICENSE ... constitutes the entire agreement between the Parties ... and supercedes all prior and contemporaneous agreements, representations, and understandings ... [and] [e]ach of the Parties acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever ... and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein."[52] This court dismissed an attempt by Progressive, which was an experienced commercial entity,[53] to bring a fraudulent inducement claim alleging that it relied on extra-contractual promises made by DuPont. The integration clause in the License Agreement, signed by Progressive, clearly indicated that Progressive was relying on only those representations and promises contained within the four corners of the Agreement. The court refused to allow Progressive to state in a written agreement that it would not rely on extra-contractual representations and then, despite this promise, claim that it relied on these representations, which would effectively sanction "false promises" in negotiated agreements.[54] DuPont, the other party to the contract, had specifically negotiated for that promise and was entitled to rely upon it. Expecting Progressive to honor its own contractual representation therefore effectuated the parties' reasonable expectations.

■ The teaching of this court, through cases such as *Great Lakes*; *H–M Wexford*; *Progressive*, and *Kronenberg* is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a "but we did rely on those other representations" fraudulent inducement claim. The policy basis for this line of cases is, in my view, quite strong.[55] If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

---

51. *H–M Wexford LLC*, 832 A.2d at 142 n. 18.

52. *Progressive*, 2002 WL 1558382, at *5.

53. *Id.* at *1.

54. *Id.* at *10.

55. Judge, now Justice, Alito embraced reasoning of this kind in a recent U.S. Court of Appeals for the Third Circuit opinion decided under Delaware law. Judge Alito recognized that, if anti-reliance clauses are not enforced, "[t]he danger is that a contracting party may accept additional compensation for a risk that it has no intention of actually bearing. This prevarication may amount to a fraud all its own ... the safer route is to leave parties that can protect themselves to their own devices, enforcing the agreement they actually fashion." *MBIA*, 426 F.3d at 218. In reaching his decision in *MBIA*, Judge Alito referenced and cited with approval the reasoning in both *Kronenberg* and *Progressive*. See *MBIA*, 426 F.3d at 215–18.

To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.

The enforcement of non-reliance clauses recognizes that parties with free will should say no rather than lie in a contract. The enforcement of non-reliance clauses also recognizes another reality that is often overlooked in morally-tinged ruminations on the importance of deterring fraud. That reality is that courts are not perfect in distinguishing meritorious from non-meritorious claims of fraud. Permitting the procession of fraud claims based on statements that buyers promised they did not rely upon subjects sellers to a greater possibility of wrongful liability,[56] especially because those statements are often allegedly oral, rather than in a writing, and thus there is often an evidentiary issue about whether the supposedly false statement ever was uttered. As important, even when a court rejects a buyer's fraud claim that is grounded in a disclaimed statement, the seller does not get the full benefit of its bargain because the costs (both direct and indirect) of the litigation are rarely shifted in America to the buyer who made a meritless claim.

For these and other reasons explained in our decisions, this court has therefore honored contracts that define those representations of fact that formed the reality upon which the parties premised their decision to bargain.[57] This sort of definition minimizes the risk of erroneous litigation outcomes by reducing doubts about what was promised and said, especially because the contracting parties have defined that in writing in their contract.

■ Nonetheless, this court consistently has respected the law's traditional abhorrence of fraud in implementing this reasoning. Because of that policy concern, we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements. In-

**56.** *See* Kevin Davis, *Licensing Lies: Merger Clauses, the Parol Evidence Rule and Pre-Contractual Misrepresentations,* 33 Val U.L. Rev. 485, 502–3 ("[P]arties ... might fear that courts are unable to determine accurately whether parties have behaved negligently or fraudulently.").

**57.** This court is by no means alone in taking this position. The courts of another leading commercial state, New York, also honor contractual provisions defining the representations of fact upon which the parties' decision to contract was made. *See, e.g., Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (N.Y.1959) ("[P]laintiff has in the plainest language an-

nounced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."); *DynCorp v. GTE Corp.,* 215 F.Supp.2d 308, 319 (S.D.N.Y. 2002) ("Dyncorp's particularized disclaimers [that extra-contractual representation that were made were not being relied upon] make it impossible for it to prove one of the elements of a claim of fraud: that it reasonably relied on the representations that it alleges were made to induce it to enter into the Purchase Agreement.").

stead, we have held, as in *Kronenberg*, that murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.[58] The integration clause must contain "language that ... can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[59] This approach achieves a sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through explicit anti-reliance language. If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.

This case, however, raises a related, but more difficult, question: to what extent may a contract exculpate a contracting party from a rescission or damages claim based on a false representation of fact made within the contract itself? May parties premise a contract on defined representations but promise in advance to accept a less-than-adequate remedy if one of them has been induced by lies about one of those material facts?

As the Buyer notes, there is a strong tradition in American law that holds that contracts may not insulate a party from damages or rescission resulting from the party's fraudulent conduct. In that vein, the Restatement of Contracts states: "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."[60] Specifically, "[a] provision in a bargain that fraud in its formation shall not be asserted is illegal."[61] The Restatement's position finds resonance in a deep body of case law as well as in leading treatises.[62] In addition, in the case of *Turkish v. Kasenetz*,[63] the Second Circuit reasoned that, contrary to the argument that only a full exemption of liability, not a mere limitation of liability, was contrary to public policy, "the rationale behind the doctrine—to prevent parties from shielding themselves from liability from their own fraud by inserting a clause into the very contract that was procured by the fraud—applies equally to the limitation of liability and to the exclusion of liability."[64] This sort of reasoning draws in no small measure from the nostrum *fraus omnia corrumpit*—fraud vitiates everything it touches.[65]

On the other hand, there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State,[66] which prides itself on having

---

**58.** *Kronenberg*, 872 A.2d at 593.

**59.** *Id.*

**60.** Restatement (Second) of Contracts § 195 (1981).

**61.** Restatement (First) of Contracts § 573 (1932).

**62.** *See* Restatement (Second) of Contracts § 195 (1981) (listing in the Reporter's Notes cases consistent with this section); Restatement (First) of Contracts § 573 (1932) (same).

**63.** 27 F.3d 23 (2d Cir.1994).

**64.** *Id.* at 28.

**65.** *See, e.g.,* CORBIN ON CONTRACTS § 28.21.

**66.** *See Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del.Ch.2005), *aff'd in pertinent part*, —— A.2d ——, 2006 WL 196379 (Del. Jan. 24, 2006) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be

commercial laws that are efficient.[67] The Seller stresses this strain in our law to buttress its argument that contracts between sophisticated parties with equal bargaining strength should be honored without intrusion by the policy concerns of unelected judges.

There are various reconciliations of this clash of interests. At one extreme, some courts are extremely grudging about enforcing contractual limitations on a buyer's right to sue for rescission or damages for an innocent misrepresentation. This reluctance has generally manifested itself in refusals to preclude negligent misrepre-

sentation claims based on general merger clauses and in requiring very specific waivers of negligence-based claims.[68] The balancing possibilities extend from there, with some courts willing to tolerate waivers of the right to sue for negligent or even grossly negligent misrepresentations.[69] As § 195 of the Restatement reflects, however, courts have generally refused to go further and allow a contractual waiver of the buyer's right to sue on the basis that a contractually-represented fact was false as a result of the seller's reckless or intentional conduct. Abundant case law to this effect exists.[70]

lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *see also State v. Tabasso Homes, Inc.,* 28 A.2d 248, 252 (Del.Gen.Sess. 1942) ("[o]f course we appreciate the fact that the right to contract is one of the great, inalienable rights accorded to every free citizen . . . and that this freedom of contract shall not lightly be interfered with"); *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 3753046, at *14 (Del.Ch. Dec. 8, 2005) (citing the "fundamental principle that parties should have the freedom to contract and that their contracts should not easily be invalidated"); *Texas Instruments Inc. v. Tandy Corp.,* 1992 WL 200604, at *5 (Del.Ch. Aug.13, 1992) (acknowledging a "powerful presumption in favor of freedom of contract"); *Fleming v. U.S. Postal Service AMF O'Hare,* 27 F.3d 259, 261 (7th Cir.1994) (Posner, J.) ("[A] premise of a free-market system is that both sides of the market, buyers as well as sellers, tend to gain from freedom of contract.").

**67.** *See Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 712 (Del.Ch.2004) (observing "Delaware law's goal of promoting reliable and efficient corporate and commercial laws"), *aff'd,* 861 A.2d 1251 (Del.2004).

**68.** *See, e.g., Greenfield v. Heckenbach,* 144 Md. App. 108, 797 A.2d 63, 81 (2002) (holding that a general merger clause did not bar evidence of pre-contractual promises in a suit for negligent misrepresentation); *Robinson v. Tripco Investment Inc.,* 21 P.3d 219, 229–30 (Utah

App.2000) (declining to allow a general non-reliance clause to bar tort claims for negligent misrepresentation but stating that a very specific clause could waive a tort claim for negligent misrepresentation); *Keller v. A.O. Smith Harvestore Products,* 819 P.2d 69, 73 (Colo. 1991) (stating that the "mere presence of a general integration clause in an agreement does not bar a claim for negligent or fraudulent misrepresentation"); *Formento v. Encanto Business Park,* 154 Ariz. 495, 744 P.2d 22, 24 (1987) (holding that a clause stating that a buyer was not relying on any statement by the seller "in connection with the Subject Property, its zoning [or] its fitness for any particular use" did not bar reasonable reliance on a representation made by the seller concerning zoning).

**69.** *See Sound Techniques, Inc. v. Hoffman,* 50 Mass.App.Ct. 425, 737 N.E.2d 920, 924–25 (2000).

**70.** *See generally Turkish,* 27 F.3d 23 (an exclusive remedy provision cannot limit a party's liability for its own fraudulent conduct when a false representation in an agreement fraudulently induced the other party to sign it); *Citibank, N.A. v. Itochu Int'l, Inc.,* 2003 WL 1797847 (S.D.N.Y. Apr.4, 2003) (an exclusive remedy provision in a Securities Purchase Agreement could not limit a party's liability for fraud in warranting the accuracy of its financial statements); *Kleinwort Benson North America, Inc. v. Quantum Financial Services Inc.,* 285 Ill.App.3d 201, 220 Ill.Dec. 457, 673 N.E.2d 369 (1996), *aff'd,* 181 Ill.2d

Delaware courts have shared this distaste for immunizing fraud. As the Buyer notes, prior Delaware decisions have used language that is generally condemnatory of contractual limitations on a party's exposure to a fraud claim for making a false statement. To wit, our courts have said that "[a] perpetrator of fraud cannot close the lips of his innocent victim by getting him blindly to agree in advance not to complain against it" [71] and "fraud vitiates every contract, and no man may invoke the law to enforce his fraudulent acts." [72] Those decisions primarily involve the protection of a relatively unsophisticated party or a party lacking bargaining clout who signs a contract with a boilerplate merger clause. [73]

But, as our recent case law indicates, Delaware is also sensitive to the need for commerce to proceed in a rational and certain way. We also respect the ability of sophisticated businesses, such as the Buyer and Seller, to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price

factors such as limits on liability. Contributing to that respect is our knowledge that judicial decisions are not the only way that commercial norms of fair play are instilled. This case is a good example. If the Seller, a private equity firm, gets a rap as a fraudster who tries to sell portfolio companies based on false representations, that Seller will pay a price. Although there are a lot more private equity firms today than there were a decade ago, the nature of that market is still such that reputational factors are likely to be important. Having a bad reputation is likely to be costly, as buyers will tend to discount the value of the tainted seller's portfolio companies as a form of self-protection as well as to demand greater remedial flexibility in the sales contract. [74]

When fashioning common law limits on contractual freedom, we must be mindful of these factors and other commercial realities, lest we inhibit economic activity that might be valuable to the parties and society more generally. [75] In that respect, the common law ought to be especially chary

---

214, 229 Ill.Dec. 496, 692 N.E.2d 269 (1998) (disallowing an exclusive remedy clause from preventing a claim for rescission where a company was fraudulently induced to close a transaction because a representation in a Stock Purchase Agreement was false as of closing).

71. *Webster v. Palm Beach Ocean Realty Co.,* 139 A. 457, 460 (Del.Ch.1927).

72. *Slessinger v. Topkis,* 40 A. 717, 718 (Del.Super.1893).

73. *See Norton v. Poplos,* 443 A.2d 1 (Del.1982) (disallowing a "boilerplate" merger clause from preventing a potential buyer of a building from relying on an innocent misrepresentation as to zoning). Later cases have read *Norton* as addressing itself to situations when the disclaimers involve unclear boilerplate and when the contracting parties were relatively unsophisticated. *See MBIA,* 426 F.3d at 215; *Kronenberg,* 872 A.2d at 590; *Great*

*Lakes,* 788 A.2d at 555. Similarly, the older cases cited by the Buyer share these characteristics with *Norton. See Webster,* 139 A. at 460 (involving a real estate sale and unclear, boilerplate merger clause).

74. Davis at 504–5.

75. *See Libeau,* 880 A.2d at 1058 ("[It is difficult to ground] a claim for the avoidance of a contract on a conflict with public policy. Delaware courts are rightly reluctant to accept such arguments. And when they do, it is not because a person has entered into a contract that has become financially inconvenient for them to honor, but because the enforcement of the contract threatens a well-recognized policy interest of concern to our polity in general. That is, the exception does not exist as a sword for parties to avoid their contracts when avoidance suits their personal interests, but as a shield to protect the community in general when the terms of a contract endanger the public interest.").

about relieving sophisticated business entities of the burden of freely negotiated contracts. There remains much harshness in the world, and such entities are unlikely candidates to place at the head of the line for judicial protection, especially when the legislature is free to consider providing such relief.[76] Moreover, the litigation realities explored earlier in the context of the enforcement of non-reliance clauses has relevance here, too. Permitting a party to sue for relief that it has contractually promised not to pursue creates the possibility that buyers will face erroneous liability (when judges or juries make mistakes) and uncompensated costs (when they incur uncompensated costs in defending successfully against a contractually-barred claim that was permitted on public policy grounds).

At the same time, a concern for commercial efficiency does not lead ineluctably to the conclusion that there ought to be no public policy limitations on the contractual exculpation of misrepresented facts. Even commentators who recognize that there are aspects of bargaining in which it is often expected that parties will lie—such as when agents refuse to disclose or misrepresent their principals' reservation price[77]—there is little support for the notion that it is efficient to exculpate parties when they lie about the material facts on which a contract is premised.[78]

I use the plain word "lie" intentionally because there is a moral difference between a lie and an unintentional misrepresentation of fact. This moral difference also explains many of the cases in the *fraus omnia corrumpit* strain, which arose when the concept of fraud was more typically construed as involving lying, and thus it is understandable that courts would find it distasteful to enforce contracts excusing liars for responsibility for the harm their lies caused.

There is also a practical difference between lies and unintentional misrepresentations. A seller can make a misrepresentation of fact because it was misinformed by someone else, was negligent, or even was reckless. All of those possibilities can be enhanced if the seller does little to investigate its own representations and compounded if the buyer does little independent due diligence of its own. The level of self-investigation expected from a seller, to me, seems to be a more legitimate subject for bargaining than whether the seller can insulate itself from liability for lies.[79]

This case involves a good example of this aspect of the problem. The Seller did

---

76. By way of example, the General Assembly enacted 6 *Del. C.* § 2704 which bans exculpatory clauses in certain contracts. Through this type of provision, which forbids contracts involving persons who construct things such as bridges, driveways, and roadways from indemnifying themselves from damages resulting from injury or death, the General Assembly has shown its willingness to limit contractual freedom when the result would violate public policy. Another prime example is the limitations on contracts between landlords and tenants. In 25 *Del. C.* § 5301 *et seq.*, landlords, for example, cannot lease "as is/where is" but instead must provide a rental unit that complies with certain minimum standards.

77. Davis at 503.

78. *Id.* at 498–500; *see also* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 4.6 (5th ed. 1998) (discussing how "[t]he lie is different. The liar makes a positive investment in manufacturing and disseminating misinformation. This investment is completely wasted from a social standpoint ...").

79. *See* Davis at 511–12 (discussing the ability of entities to monitor the representations made by its agents and the associated costs and difficulties).

not manage the Company being sold directly. Most of the key representations of fact were made by the Company to the Buyer in the first instance, primarily through managers working directly for the Company who were not otherwise affiliated with the Seller.[80] The Seller did not necessarily possess the same information as the managers of the Company.

In this circumstance, it seems legitimate for the Seller to create exculpatory distance between itself and the Company.[81] That is, I find it difficult to fathom how it would be immoral for the Seller and Buyer to allocate the risk of intentional lies by the Company's managers to the Buyer, and certainly that is so as to reckless, grossly negligent, negligent, or innocent misrepresentations of fact by the Company. Such an allocation of risk does not permit the Seller to engage in consciously improper conduct itself, it simply requires the Buyer to hold the Company and its speaking managers exclusively responsible for their own misstatements of fact.[82]

In considering how to allocate the risk of misrepresentations consistent with public policy, I also consider our General Assembly's approach to exculpation in the case of business entities. In the corporate context, the General Assembly has permitted corporate charters to exculpate directors for liability for gross negligence.[83] In the alternative entity context, where it is more likely that sophisticated parties have carefully negotiated the governing agreement, the General Assembly has authorized even broader exculpation, to the extent of eliminating fiduciary duties altogether.[84]

Given these statements of policy by our General Assembly, it is appropriate for the

**80.** Am. Compl. ¶¶ 24, 28, 45, 46, 47, 50, 51, 58, 59, and 63.

**81.** In a recent case involving a similar context, our Supreme Court expressed its recognition of the legitimacy of such distance. *See DCV Holdings*, 889 A.2d 954, 2005 WL 3695841, at *4–5.

**82.** I recognize that I am drawing a different line than § 195 of the Restatement by drawing the line at lies rather than recklessly conveyed false statements. I do so because I think it both more efficient and fair only to override a contractual limitation on liability when that limitation would exonerate an actual liar or someone complicit in a lie. That conclusion is also supported by my appreciation of the fallibility of judges and juries. To that point, it is fair to point to the case of *Smith v. Van Gorkom* as an example of the tendency of courts, in the business context, to be less than rigorous in their application of state of mind requirements. *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985). That decision might have produced useful changes in practice but it is hardly a model for the principled application of the concept of gross negligence and arguably involved facts that, when considered in their totality, did not even amount to simple negligence. By limiting the intrusion of public policy on contractual free-

dom to the preservation of remedies for victims of proven liars, we reduce the risk of erroneous judgments of this kind.

**83.** 8 *Del. C.* § 102(b)(7) (allowing limitation of director liability except "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law ... or (iv) for any transaction from which the director derived an improper personal benefit.").

**84.** 6 *Del. C.* § 17–1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) ... to a limited partnership ... the partner's ... duties and liabilities may be expanded or restricted or eliminated by provisions in a partnership agreement."); 6 *Del. C.* § 18–1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) ... to a limited liability company ... [t]he member's or manager's ... duties and liabilities may be expanded or restricted or eliminated by provisions in a limited liability company agreement.").

judiciary in fashioning common law to give as much leeway to sophisticated business parties crafting acquisition agreements as is afforded to those who write the governing instruments of limited partnerships and limited liability companies. We should be reluctant to be more restrictive of freedom of contract than those elected by our citizens to write the statutory law.

With that in mind, I resolve this case in the following manner. To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State. That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either: 1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty. This will require the Buyer to prove that the Seller acted with an illicit state of mind, in the sense that the Seller knew that the representation was false and either communicated it to the Buyer directly itself or knew that the Company had. In this case, that distinction is largely of little importance because of the Officer's Certificate provided by the Seller. In that certificate, the Seller certified that (1) each representation and warranty of the Company and Seller was true and correct as of the closing date; (2) the Seller and Company performed and complied in all material respects with the agreements and covenants required to be performed or complied with; and (3) between the date of signing the Stock Purchase Agreement and closing, there had been no change, event or condition of any character which had or would reasonably be expected to constitute a material adverse effect for the Company.

By contrast, the Buyer may not obtain rescission or greater monetary damages upon any lesser showing. If the Company's managers intentionally misrepresented facts to the Buyer without knowledge of falsity by the Seller, then the Buyer cannot obtain rescission or damages, but must proceed with an Indemnity Claim subject to the Indemnity Fund's liability cap. Likewise, the Buyer may not escape the contractual limitations on liability by attempting to show that the Seller acted in a reckless, grossly negligent, or negligent manner. The Buyer knowingly accepted the risk that the Seller would act with inadequate deliberation. It is an experienced private equity firm that could have walked away without buying. It has no moral justification for escaping its own voluntarily-accepted limits on its remedies against the Seller absent proof that the Seller itself acted in a consciously improper manner.[85]

---

85. As a matter of logical consistency and intellectual candor, it is important to recognize that the line I draw still leaves a residual double liar problem. That is, if the Buyer in fact promised not to sue for rescission even if the Seller lied to it about the accuracy of a contractual representation, its decision to later renege on that promise suggests that it was untruthful in making the promise in the first instance. This concern is far less compelling than in a situation when a buyer that has expressly disclaimed reliance upon, or the existence of, extra-contractual statements of fact claims that it relied upon such statements in determining to sign or close a contract. For one thing, the promise is far more explicit than the usual remedial limitations buyers accept, as this case illustrates. Although I agree with the Seller's reading of the Agreement, the Agreement does not explicitly state that the Buyer was waiving the right to rescind even if the Seller and Company lied about contractual representations. Furthermore, in this context, it is also not unrealistic to assume that the contracting parties knew that there were public policy

In sum, I conclude that the Seller's motion to dismiss the complaint in its entirety must be denied. But the Buyer may only obtain its desired relief—rescission or in the alternative, full compensatory damages—if it meets the burden of proof described.[86]

### IV. *Conclusion*

For the foregoing reasons, the Seller's motion to dismiss is granted as to Count III, the negligent misrepresentation count, and granted as to the remaining counts to the extent described. The motion is otherwise denied. The parties shall confer and seek a conference with the court if they cannot reach agreement on the date to begin trial. In that respect, they should know that the case will proceed to trial directly and expeditiously without additional dispositive motion practice. IT IS SO ORDERED.

limitations that would come into play, to the extent that the contract attempted to exculpate the Seller for lies about contractual representations, and that the Buyer was not necessarily lying when it promised to limit its remedial options. *See* ABA Comm. on Negotiated Acquisitions, Model Stock Purchase Agreement 143 ("In the absence of a specific provision to the contrary, the Buyer's remedies for inaccuracies in the Sellers' representations may not be limited to those provided by the indemnification provisions; the Buyer may also have causes of action based on breach of contract, fraud and misrepresentation ... The Sellers therefore may want to add a clause providing that the indemnification provisions are the sole remedy for any claims relating to the sale of the shares ... Other claims, including those based on common law fraud, may also survive an exclusivity clause under applicable state law."); *cf.* ABA Comm. on Negotiated Acquisitions, Model Agreement and Plan of Merger and Reorganization 207 (noting that, even in the context of a public company merger, irrespective of a contractual provision stating that representations and warranties do not survive the closing, such a provision would not normally preclude post-closing fraud claims by one party against former officers and directors of the other party). Finally, sellers do not face as much evidentiary uncertainty as a result of this balance as they do from a refusal to enforce a non-reliance provision. By refusing to enforce a non-reliance provision, a court subjects a seller to the risk that the court will erroneously conclude that the seller even made an extra-contractual representation of fact. By contrast, by refusing to allow a contract to exculpate a seller for lies about contractual representations of fact, there is no evidentiary uncertainty over whether the allegedly false representations were made, only over whether they were materially false and whether the seller knew them to be false.

**86.** Of course, it will be incumbent upon the Buyer to prove reasonable reliance, an element that is required by common law fraud and that also has relevance in contract law in this context. *See Browne v. Robb*, 583 A.2d 949, 955 (Del.1990) ("The general elements of common law fraud [include] ... action or inaction [resulting] from a reasonable reliance on the representation."); *H–M Wexford*, 832 A.2d at 142–43 ("Justifiable reliance is an element of common law fraud, equitable fraud, and negligent misrepresentation under Delaware law. Because Wexford cannot claim that it justifiably relied on the information in the PPM, these claims must fail as a matter of law."). In that respect, nothing in this opinion suggests that a buyer can escape an exclusive remedy provision when it was aware of the falsity of a contractual representation of fact before the closing and nonetheless elected to close on the contract, despite having a contractual right to terminate. *See* ABA Comm. on Negotiated Acquisitions, Model Stock Purchase Agreement 139 ("The Buyer's ability to assert a fraud claim based on ... the common law after the closing may be adversely affected if the Buyer discovers an inaccuracy before the closing but fails to disclose the inaccuracy to the Sellers until after the closing."). In that scenario, there is no public policy interest in permitting the buyer to escape a remedial limitation when they could have avoided the contract simply by refraining from closing.